UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NICHOLAS MEADE,

        Plaintiff,

                              Case No.:  05-CV-71322-DT

vs.

                              HON. ROBERT H. CLELAND
                              MAG. JUDGE WALLACE CAPEL, JR.

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant,
_____/

## REPORT AND RECOMMENDATION

**I.    RECOMMENDATION**

It is recommended that the Court deny Plaintiff's Motion for Summary Judgment, grant Defendant's Motion for Summary Judgment, and enter judgment for Defendant.

**II.    REPORT**

This is an action for judicial review of the Defendant Commissioner's final decision denying Plaintiff's application for a period of disability, disability insurance benefits [DIB], and supplemental security income [SSI].  Plaintiff applied for benefits in March 2002, alleging that he has been disabled and unable to work since October 15, 2001,[1] due to "lungs, heart attack, clogged heart valve, last 3 finger right hand, right knee, [and] left eye - legally blind."  (TR 41-44, 58). Benefits were denied initially on October 22, 2002.  (TR 26-33, 302-08).  A de novo hearing was

---

[1] Plaintiff's "Leads/Protective Filing Worksheet," states that October 1, 2001, is the onset date.  (TR 44).

held on May 5, 2004, before Administrative Law Judge [ALJ] Regina Sobrino. (TR 317-54). In a decision dated August 18, 2004, the ALJ found that Plaintiff could perform a limited range of sedentary work. (TR 13-18). The ALJ's decision became the Commissioner's final decision when the Appeals Council denied review on February 25, 2005. (TR 4-6). The Plaintiff has commenced this action for judicial review.

      A.      **<u>PLAINTIFF'S TESTIMONY</u>**

Plaintiff stated that he was born on April 12, 1964, and forty years of age at the time of the first hearing. (TR 322). He stated that he lives in a mobile home with his girlfriend in Oscoda, Michigan. <u>Id.</u> He stated that he graduated high school, completed two years of business school and received a certificate, but not a diploma. <u>Id.</u>

Plaintiff testified that all of his previous jobs were full-time. (TR 344). He testified that in 1990, he worked at Taylor Recycling for about one to two years and was only paid about four or five dollars an hour. <u>Id.</u> Then he stated that he worked at Granite Great Atlantic and Pacific Tea Company, which he referred to as Farmer Jacks A & P, in 1993 as a cashier. <u>Id.</u> He stated that he never quit working at Farmer Jacks and was also a slitter and bander for Worthington Steel for a short time. (TR 345). He also reported working as a cashier for Speedway for a small period of time. <u>Id.</u> He also signed up with a temporary service through Snelling Personnel, but never found a position with same. <u>Id.</u>

He stated that he became disabled on October 15, 2001, and has not worked since that date. (TR 322-23). He stated that the money earned in 2001 was prior to that date. (TR 323). He reported that he stopped working as a machinist because he had a heart attack. <u>Id.</u> He explained that he had been working for Future Tool and Machining at that time for about eight months. (TR 346).

He stated that he has residual problems, but has not had any heart surgery. (TR 323). He explained that he is supposed to have testing on his heart, but he is having problems with his health insurance. (TR 323, 351).

Plaintiff testified that his right hip goes numb when he sits too long. (TR 324). He believes that Scoliosis in the middle of his back causes the problem. Id. He stated that he can usually sit for fifteen minutes before he has to stand and stretch. Id. He stated that when he sits back down he straightens out his legs to alleviate the numbness. (TR 324-25). He stated that he can stand for about ten minutes. (TR 325). He stated that he used to be able to stand for at least half an hour prior to a week ago, but now the combination of his hip and knee pain has intensified. Id. Plaintiff explained that when he was younger he had surgery as a result of a hockey injury that tore the ligaments in his knee. Id. He explained that he was unable to stand for longer than thirty minutes because the weight on his knee would hurt his leg. (TR 325).

He stated that he has to rest his knee about three times a day. (TR 340). He explained that he elevates his knee using a foot stool with a pillow for a couple of hours at a time. Id. He stated that this helps and he also uses ice to relieve the pain and swelling. (TR 340-41). He stated that he usually spends a total of six hours a day with his knee elevated. (TR 341). He stated that he has to wrap his knee and rest it if he stands too much or sits in a chair too long, such as like at the hearing. (TR 340).

He stated that when he walks he usually leans on something, such as a shopping cart when he gets his groceries. (TR 326). He reported that after he walks up half an aisle, he has to stop and rest. Id. He stated that he tried to obtain a cane, but his insurance would not cover it. Id.

Plaintiff testified that the doctor told him after his heart attack not to lift more than five pounds, which is what he limits himself to on a daily basis. Id. Plaintiff testified that the last two fingers on his right hand were cut off and reattached when he was eleven or twelve years old. (TR 324).

He stated that he is right-handed and has trouble using his right hand to hold a pen or pencil or pick up coins from a table. (TR 326, 336). He testified that his fingers are weak and he only uses three fingers. (TR 327). He stated and demonstrated that he cannot make a full fist with his right hand. (TR 336). However, he stated that he is still trying to use his right hand as the dominant upper extremity. (TR 336-37).

He stated that he does not have trouble reaching over his head or reaching out, but he does have difficulty bending at the waist. (TR 327). He explained that it hurts his hip to do same. Id. He stated that he bends his knees and crouches down if he needs to pick something up off of the floor. (TR 327-28). He stated that if he does same too often his right knee will flare up. (TR 328). He stated that he does not use stairs unless he absolutely has to because of his leg and knee. Id. He explained that his right leg will "kind of give" out. Id. However, he stated that he has never fallen because he holds onto the railing. Id. He stated that he also had a hernia operation when he was younger. (TR 337).

Plaintiff testified that his landlord takes care of the yard work as it is included in the rent. (TR 328). He stated that he will start the dishes and his girlfriend finishes them. Id. He stated that he will go shopping for one or two items and spend about fifteen minutes in the store and again, his girlfriend will finish the rest of the shopping. (TR 328-29). He stated that he has a cat, but "he's pretty self-reliant." (TR 329). He stated that he does not belong to any clubs or organizations. Id.

Plaintiff reported that he does have friends that visit him.  Id.  He testified that he collects baseball cards and watches the news and reads papers.  Id.

He stated that in June 2002 he twisted his foot climbing a ladder.  (TR 341).  He explained that it was a two step foot stool and he was trying to put a bowl away in the kitchen cabinet above the sink.  Id.  Plaintiff reported that he presently does not have trouble bathing or dressing himself.  (TR 329).  He stated that he does not take out the trash, but he does drive.  Id.

However, he testified that he has been getting dizzy lately, so he does not drive more than two miles from his home.  Id.  He stated that his family doctor is still trying to determine what is causing the dizziness, but it is suspected that it is related to his heart.  (TR 329-30).  He testified that his friend brought him to the hearing.  (TR 330; see also TR 341-42).  He reported that he went with a friend to Taylor, near Detroit, Michigan, to see his sister while she was in the hospital.  (TR 330).  He reported that his friend did all the driving on the trip.  Id.

Plaintiff reported that he takes Atenolol, a blood pressure medication and Nitroglycerine as needed.  (TR 330-31).  He stated that he last took the Nitroglycerine tablet a couple of days prior to the hearing.  (TR 331).  He stated that he takes it for chest pain, but "[i]t doesn't go away completely, but it subsides to where it's bearable."  Id.  He reported that he does not have any side effects from his medications.  Id.

Plaintiff testified that he has been in the hospital a couple of times since April 2001, in which he went to the emergency room, stayed overnight and had echograms.  (TR 331-32).  He stated he was given Nitroglycerine at the hospital and told to go see his family physician.  (TR 332).  Plaintiff then stated that he went to the emergency room at Oakwood Heritage Hospital in Taylor on November 26, 2001.  (TR 333-34).  Plaintiff testified that he has been to the emergency room again,

but only had to stay overnight one other time. (TR 335). He reported that they were going to do a stress test the following morning but then came in and sent him home without an explanation. Id.

He explained that his onset date is in October because he was having chest pains and went to his doctor, but did not go into the emergency room at that time. (TR 334-35). Plaintiff stated that his doctor told him that he had a minor heart attack and that he needed to quit smoking. (TR 335). Plaintiff stated that he still "smoke[s] one cigarette every three days," but "used to smoke three packs a day." Id.

Plaintiff testified that currently his physician is Dr. Boloczko, and that previously he saw Dr. Payea. (TR 336). He stated that these are general doctors and not heart specialists. Id. Plaintiff stated that he is supposed to have a heart catherization, but he is having difficulty finding a doctor that will take the "adult waiver program." (TR 337, 351). He testified that some doctors have turned him down. (TR 337-38). For example, he stated that he went to see Dr. Cannon, but once he was at his office, the doctor "said [he] was fine and sent [him] back to the other doctor." (TR 338).

Plaintiff testified that he is blind in his left eye. (TR 337). He stated and demonstrated that if he covers up his right eye, his vision is "a blur." Id. He testified that he had a physical for a second job a couple of years prior to the hearing and he was denied after an eye exam. (TR 339). He reported that he was told that he could not operate any machinery such as a hi-lo or drill press because of his eye. Id.

He testified that he feels good enough to leave his home, but if it is damp or really hot outside he has trouble breathing. (TR 338). In such cases, Plaintiff reported that he "want[s] to sit in bed most of the day with like a fan blowing to where [he] can get some cool air to where [he] can

breath." Id. He stated that cold weather also affects his breathing as well as his hand and knee. Id. He stated that about seventeen days out of a month his problems prohibit him from leaving his house. (TR 338-39).

Plaintiff testified that he is married, but separated from his spouse. (TR 339). He stated that he has an eighteen year old daughter who lives with her mother and to his knowledge she is still in school. Id.

### B. MEDICAL EVIDENCE

Examinations of the parties' cross-motions for summary judgment and the ALJ's decision reveal that an additional recitation of the Plaintiff's medical evidence would be repetitive. The pertinent record medical evidence relied upon by this Court is fully articulated in the Analysis.[2]

### C. VOCATIONAL EXPERT'S TESTIMONY

Judith Catherine Findora, a vocational expert, testified at the hearing. (TR 342–43, 346-49). The VE testified that Plaintiff's past work was categorized as follows: machine operator, medium and unskilled; cashier, light and unskilled; stock clerk, medium and unskilled; grounds keeper, medium and unskilled; and chrome plater, medium and unskilled. (TR 343).

The ALJ asked the VE to assume a claimant with Plaintiff's age, education, and work experience and to further assume that such a claimant

> is limited to lifting, carrying, pushing or pulling no more than 10 pounds. The individual is able to stand and walk six of eight hours in eight-hour [sic] work day and sit for eight hours in eight-hour [sic] work day. The individual should not climb ladders, ropes or scaffolds, should not crawl, can rarely crouch, can occasionally climb stairs and occasionally stoop. The individual cannot perform forceful gripping, grasping, twisting or squeezing with the right hand and that is the dominant hand. The individual is limited to occasion [sic] handling and fingering with the

---

[2]See Subpart E, infra.

> right dominant hand. . . . The individual should not be exposed to hazards, should not operate right foot or leg control, should have a clear air environment, should not be exposed to extremes of cold or drive as a work duty. The individual needs to perform work that's compatible with vision in only the left eye, so needs to have work that can be done by someone with monocular vision.

(TR 346-47). The VE testified that under such a hypothetical the claimant could not perform his past relevant work. (TR 347). The ALJ asked whether there was other work that such a claimant would be capable of performing. Id. The VE testified to the following positions in the light category in approximate numbers, including but not limited to: general clerical, 11,000 positions; usher, 1,300 positions; laundry worker, 3,000, positions; sales, 18,000 positions; security, 5,000 positions; child care worker, 2,800 positions; file clerk, 3,000 positions; and order filler, 3,800 positions. (TR 347-48). The VE testified to the following positions in the sedentary category in approximate numbers, including but not limited to: general clerical, 5,000 positions; surveillance system monitor, 1,500 positions; order clerk, 4,000 positions; administrative support, 3,000 positions; telephone solicitation, 3,400 positions; sorter, 1,000 positions; receptionist, 4,000 positions; and investigator, 3,000 positions. (TR 348). The VE stated that her testimony was consistent with the Dictionary of Occupational Titles [DOT]. Id.

Plaintiff's counsel asked the VE what portion of the aforementioned positions actually exist in the upper third region of the lower peninsula. (TR 349). The VE stated that approximately one-third of the positions exist in that region. Id. Plaintiff's counsel then asked the VE whether the need to elevate the leg as Plaintiff testified would preclude competitive employment. Id. The VE stated that if it took place during the work day then it would be preclusive. Id.

**D.    ALJ'S CONCLUSIONS**

The ALJ found that the "[o]bjective medical evidence demonstrates......chronic obstructive pulmonary disease/emphysema, degenerative disc disease of the spine, residuals of a right hand injury sustained in 1977, left eye blindness and degenerative joint disease of the knees." (TR 15-16, 17).  She considered these "severe." Id.  However, he does not have an impairment either alone or in combination, sufficiently severe to meet or medically equal the criteria of any condition in the Medical Listings in Appendix 1, Subpart P, Part 404 of the Regulations.  (TR 16, 17).  The ALJ found Plaintiff's allegations regarding his limitations are not totally credible. Id.  She determined that Plaintiff had the residual functional capacity [RFC] to perform a limited range of sedentary work. (TR 16, 18).  Therefore, the ALJ concluded that Plaintiff is not eligible for DIB. (TR 17, 19).

**E.    ANALYSIS**

Plaintiff advances several claims in his Motion for Summary Judgment.  His Motion argues that the ALJ's decision is not supported by substantial record evidence because: (1) the Commissioner erred as a matter of law in assessing his credibility; and (2) the ALJ failed to form a proper hypothetical that accurately portrayed his impairments.[3]  In response, Defendant's Motion for Summary Judgment contends that these aspects of the ALJ's decision are supported by substantial evidence.[4]  The matter is now ready for decision.

---

[3] Plaintiff's Motion for Summary Judgment and Brief filed August 1, 2005 (hereinafter "Plaintiff's Brief"), at pages 9-11.

[4] Defendant's Motion for Summary Judgment and Brief filed September 21, 2005 (hereinafter "Defendant's Brief"), at pages 5-9.

9

### 1. Standard of Review

The findings of the ALJ regarding Plaintiff's disabled status are conclusive if supported by substantial evidence based on the record as a whole. 42 U.S.C. § 405(g) (1997). Substantial evidence means such evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971). It is more than a scintilla of evidence, but less than a preponderance of evidence. Brainard v. Sec'y of Health and Human Servs., 889 F.2d 679, 681 (6th Cir. 1989).

This standard presupposes that there is a "zone of choice" within which the ALJ may make a decision without being reversed. Felisky v. Bowen, 35 F.3d 1027, 1035 (6th Cir. 1994). Even if the court might arrive at a different conclusion, an administrative decision must be affirmed if it is supported by substantial evidence. Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986). Finally, consideration of the whole record does not mean that the ALJ must mention or comment on each piece of evidence submitted. Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998); see also Thacker v. Comm'r of Soc. Sec., 99 Fed.Appx. 661, 665 (6th Cir. 2004) (unpublished). Applying these standards, I will analyze each of Plaintiff's claims.

#### a. Credibility

Plaintiff alleges that the ALJ improperly assessed his credibility.[5] In evaluating subjective complaints of disabling pain, this court looks to see whether there is objective medical evidence of an underlying medical condition, and if so then, 1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or, 2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged

---

[5]Plaintiff's Brief at pages 9-11.

10

disabling pain. <u>McCoy on Behalf of McCoy v. Chater</u>, 81 F.3d 44, 47 (6th Cir. 1995) (quoting <u>Stanley v. Sec'y of Health and Human Servs.</u>, 39 F.3d 115, 117 (6th Cir.1994) (citing <u>Jones v. Sec'y of Health and Human Servs.</u>, 945 F.2d 1365, 1369 (6th Cir.1991) and (quoting <u>Duncan v. Sec'y of Health and Human Servs.</u>, 801 F.2d 847, 853 (6th Cir.1986)).

In order to determine disability based on subjective complaints, we look to 20 CFR § 404.1529(c)(3) and the following factors:

> 1. The individual's daily activities;
> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
> 3. Factors that precipitate and aggravate the symptoms;
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
> 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
> 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 minutes to 20 minutes every hour, or sleeping on a board); and
> 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

As Social Security Ruling (SSR) 96-7p points out, the ALJ's "determination or decision must contain specific reasons for the finding on credibility . . . to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." <u>See also</u>, <u>Murray v. Comm'r of Soc. Sec.</u>, 2004 WL 1765530, *4 (E.D. Mich., Aug. 3, 2004).

> The ALJ found that
> 
> the medical and other evidence does not substantiate the intensity, persistence and functionally limiting effects of the symptoms alleged by the claimant. The record does not establish that the claimant has coronary artery disease. Tests indicate that he has normal heart function. Recent catheterization showed normal coronary arteries. The claimant has a diagnosis of emphysema but he does tolerate cigarette smoke. His right hand is functional, although there are limitations in handling, fingering, and grasping. He carries on activities of daily living, including shopping,

>   doing light household chores, and driving short distances. He plays cards, plays board games, reads newspapers, and watches television (Exhibit 7E).

(TR 16). Plaintiff challenges the ALJ's failure to reference "his need for periodic rests of his knee throughout the day for the other jobs," even though she determined that his knee impairment was severe and limited his ability to do his past relevant work.[6]

However, prior to the credibility discussion the ALJ noted that Plaintiff complained of right knee pain. The ALJ specifically stated that during a September 7, 2002, consultative examination, "he related a history of right knee injury that has developed osteoarthritis that is aggravated by cold or rainy weather. *He has had no physical therapy or medication for this condition*."  (TR 15) (emphasis added). The examination showed that "[t]he right knee had some limitations as he walks with a mild limp but his range of motion is normal in the right knee." Id.

Further, as Defendant points out,

>   Plaintiff admitted in a report to the state agency that his knee pain had not changed since its onset in 1977 (Tr. 77), and Plaintiff worked fairly steadily since that time despite his alleged knee pain (Tr. 68). See Blacha v. Secretary of Health & Human Servs., 927 F.2d 228, 231 (6th Cir. 1990) ("[I]t is significant that [the claimant] continued to work . . . for two years after his accident.... there is no objective evidence that his condition declined significantly during that two-year interval.").

>   Moreover, the medical evidence from the examining physicians provides ample support for the ALJ's conclusion that Plaintiff's knee impairment did not preclude him from performing the range of work the ALJ identified. Drs. Hachigian and Lazzara found on examination that Plaintiff had some crepitus in his right knee but no effusion or synovial thickening, his range of motion was essentially normal, and he had normal muscle tone and strength (Tr. 181-82). Although Plaintiff walked with a mild limp, he used no ambulatory aid and said he could walk a block (Tr. 78-79, 183). Contrary to Plaintiff's argument, the ALJ's residual functional capacity (RFC) finding reasonably accommodated any credible limitations attributable to Plaintiff's right knee impairment . . .[7]

---

[6]Plaintiff's Brief at pages 9-10.

[7]Defendant's Brief at page 8.

Plaintiff mentioned for the first time the need to elevate his knee at the hearing. (TR 340-41). Thus, although the ALJ did not specifically mention Plaintiff's alleged need to rest and elevate his knee for six hours daily, id., it is harmless error given the ALJ's assessment of the knee and the lack of evidence regarding the need for same.

### b.     Hypothetical

Plaintiff further argues that the ALJ failed to include the need to elevate his knee in her hypothetical to the VE.[8] The VE testified that Plaintiff's testimony regarding same if occurring during the work day, would preclude all employment. (TR 349). Plaintiff states that "[t]his need is supported by the medical records and thus should be conclusive as to his claim for disability," and relies on Geisz v. Apfel, 100 F. Supp. 2d 463 (E.D. Mich. 2000) and Runyon v. Apfel, 100 F. Supp. 2d 447, 450 (E.D. Mich. 1999).[9]

However, Plaintiff does not cite to where in the record this need is so substantiated. Further, the undersigned's review of the record fails to reveal same. Additionally, in Geisz, the treating physician "found that Plaintiff's condition required her to lay down on a daily basis." Geisz, 100 F.Supp.2d at 465. In Runyon, 100 F.Supp.2d at 450, the district court did hold that "the VE's response to the hypothetical question was not supported by substantial evidence in the record, inasmuch as the questions posed did not accurately portray Plaintiff's impairments." Nonetheless, the record does not support same here.

Further, the ALJ does not have to include all medical conditions or restrictions. As in Maziarz v.Secretary of Health & Human Servs., 837 F.2d 240, 247 (6th Cir. 1987),

---

[8] Plaintiff's Brief at page 10.

[9] Plaintiff's Brief at page 10.

> [t]he vocational expert merely responded to several hypothetical questions which presumed different physical restrictions allegedly placed on claimant. The vocational expert did not determine what restrictions claimant in fact had. Rather, it was the ALJ's function to first determine what medical restrictions claimant was under and how they affected his residual functional capacity, and then to determine whether the vocational expert had identified a significant number of jobs in a relevant market given these restrictions.

Further,

> [i]n Foster v. Halter, 279 F.3d 348 (6th Cir. 2001), we stated that a hypothetical question need only reference all of a claimant's limitations, without reference to the claimant's medical conditions. Foster, 279 F.3d at 356. In Varley v. Sec'y of Health and Human Servs., 820 F.2d 777 (6th Cir. 1987), a case cited in Howard, we likewise determined that a vocational expert need only "take[ ] into account plaintiff's limitations." Varley, 820 F.2d at 780.

Webb v. Comm'r of Soc. Sec., 368 F.3d 629, 633 (6th Cir. 2004).

> The vocational expert's testimony is directed solely to whether, given a claimant's age, experience, and education, along with the ALJ's assessment of what she "can and cannot do," there exist a significant number of employment opportunities for her in the regional and national economies. The vocational expert is not expected to evaluate the claimant's medical conditions in making this determination. Indeed, vocational experts are not required to have any medical training, so any evaluation of medical evidence they perform would be outside their area of expertise. Accordingly, in light of the facts present in Howard, this circuit's prior case law, and the role of a vocational expert under the social security regulations, we do not read Howard to hold that hypothetical questions to vocational experts are required to include lists of claimants' medical conditions.

Webb, 368 F.3d at 633. Specifically, the Court analyzed its previous decision in Howard v. Comm'r of Soc. Sec., 276 F.3d 235 (6th Cir. 2002), recognizing that while

> [t]he hypothetical question posed to a [vocational expert] for purposes of determining whether Howard can perform other work, on the other hand, should be a more complete assessment of her physical and mental state and should include an "accurate [ ] potray[al] [of her] individual physical and mental impairment[s]." Varley v. Sec'y of Health and Human Servs., 820 F.2d 777, 779 (6th Cir. 1987); Myers v. Weinberger, 514 F.2d 293, 294 (6th Cir.1975) (per curiam). Thus, while the [residual functional capacity] should focus on Howard's abilities or, in other words, what Howard can and cannot do, the hypothetical question should focus on Howard's overall state including Howard's mental and physical maladies. . .

> [t]he vocational expert is not expected to evaluate the claimant's medical conditions in making this determination. Indeed, vocational experts are not required to have any medical training, so any evaluation of medical evidence they perform would be outside their area of expertise. Accordingly, in light of the facts present in Howard, this circuit's prior case law, and the role of a vocational expert under the social security regulations, ***we do not read Howard to hold that hypothetical questions to vocational experts are required to include lists of claimants' medical conditions.***

Id. (emphasis added). Therefore, the ALJ was not required to list Plaintiff's knee impairment in her hypothetical questions to the VE.

### III.   CONCLUSION

For the reasons stated, I find that the ALJ's decision denying Plaintiff benefits is substantially supported in the record. Accordingly, I respectfully recommend that the Court **DENY** Plaintiff's Motion for Summary judgment, **GRANT** Defendant's Motion for Summary Judgment, and enter judgment for Defendant Commissioner.

### IV.   REVIEW

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten days of service of a copy hereof as provided for in 28 U.S.C. section 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. United States v. Walters, 638 F.2d 947 (6th Cir. 1981), Thomas v. Arn, 474 U.S. 140 (1985), Howard v. Secretary of HHS, 932 F.2d 505 (6th Cir. 1991). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. Smith v. Detroit Fed'n of Teachers Local 231, 829 F.2d 1370, 1373 (6th Cir. 1987), Willis v. Secretary of HHS, 931 F.2d 390, 401 (6th Cir. 1991). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objection must be served upon this Magistrate Judge.

Any objections must be labeled as "Objection #1," "Objection #2," etc.; any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains. Not later than ten days after service an objection, the opposing party must file a concise response proportionate to the objections in length and complexity. The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.

                                        s/Wallace Capel, Jr.
                                        **WALLACE CAPEL, JR.**
                                        **UNITED STATES MAGISTRATE JUDGE**

**Dated:**   March 29, 2006

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

**CERTIFICATE OF SERVICE**

I hereby certify that on <u>March 29, 2006</u>, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: <u>James Brunson, Assistant United States Attorney, 101 First Street, Suite 200, Bay City, Michigan 48708</u>.

and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participant(s):  <u>Robert Fortunate, 155 West Congress, Suite 350, Detroit, Michigan 48226-3294, and the Social Security Administration, Office of the Regional Counsel, 200 W. Adams Street, 30th Floor, Chicago, Illinois 60606</u>.

                                                <u>s/James P. Peltier</u>
                                                United States District Court
                                                Flint, Michigan 48502
                                                810-341-7850
                                                E-mail: pete_peltier@mied.uscourts.gov